UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ROBERT N. ANDERSON,

                Plaintiff,

        v.                               91-CV-01294

CESAR A. PERALES, Individually and as
Commissioner, New York State Department
of Social Services; JUDITH BEREK,
Individually and as Deputy Commissioner,
New York State Department of Social
Services; MARY HART, Individually
and as Regional Director, New York State
Department of Social Services; PAUL
ELISHA, Individually and as an Employee,
New York State Department of Social
Services; and TERRANCE McGRATH,
Individually and as an Employee, New
York State Department of Social Services,

                Defendants,

APPEARANCES:                        OF COUNSEL:

DENNIS B. SCHLENKER, ESQ.
Attorney for Plaintiff
174 Washington Avenue
Albany, NY 12210

WILLIAM E. STANTON, ESQ.
Attorney for Plaintiff
P.O. Box 1252
Merrit Avenue and Elm Drive
Millbrook, NY 12545

ELIOT SPITZER                       DAVID B. ROBERTS
Attorney General of the           Assistant Attorney General
State of New York
Attorney for Defendants
The Capitol
Albany, NY 12224

**HOWARD G. MUNSON, SR. J.**

## MEMORANDUM  DECISION AND ORDER

### BACKGROUND

For over 20 years, plaintiff was the operator of Woodcrest Manor Home for Adults, a proprietary home for adults (Woodcrest), located in Rhinebeck, NY.  The facility was an adult care facility fully licensed by the State under Article 7 of the New York Social Services Law, with an operating certificate issued by the New York State Department of Social Services ("the DSS")  permitting the accommodation of 104 residents.

DSS is obliged to undertake inspections of nursing homes to insure compliance with pertinent state and federal regulations.   Plaintiff, Woodcrest's owner, instituted this lawsuit under  42 U.S.C. § 1983, alleging that DSS violated his constitutional rights by carrying  out repetitive, unreasonable and retaliatory inspections of Woodcrest.

On November 8, 1991, plaintiff instituted an action under 42 U.S.C. § 1983.  The complaint alleges that defendants have conspired to deprive plaintiff of his Due Process and First Amendment rights secured by the United States Constitution.  Plaintiff claims that he was a  long term critic of the New York State Department of Social Services ("DSS") and its defendant employees, frequently expressing his dissatisfaction with the programs and policies of the DSS as they concerned the care and treatment of developmentally disabled adults.

The plaintiff previously moved for a preliminary injunction in this action, founded upon

2

the complaint's allegations. After a four day preliminary injunction hearing in January 1992, this court issued an order denying the sought for relief.

In April 1992, the DSS served plaintiff with a Notice of Suspension of Operating Certificate and Order, and a Notice of Hearing and Statement of Charges for use in the administrative hearing.  The notice stated that Woodcrest's operation certificate was being suspended for 30 days and ordered plaintiff to immediately discharge all residents, and to admit no new residents, pending a hearing.  This action was taken upon allegations that four Woodcrest residents had been sexually and physically abused by plaintiff; two former residents were raped by another resident; and several former residents had been struck by another resident, who also robbed another resident at knife point. Other allegations stated that plaintiff had prevented the Department from inspecting Woodcrest; that he did not prevent resident on resident intimation and harassment, he interfered with inspection by New York State personnel; on five separate occasions neither plaintiff nor the person designated to be in charge of the facility were not there; and, that plaintiff and his agents repeatedly coerced and intimidated residents who wanted to leave Woodcrest, thereby preventing them from exercising their right to do so.

Plaintiff quickly sued the DSS in New York State Supreme Court, seeking an injunction against it and a declaration that New York Social Services Law § 460-d, subd. 4, par (b), was unconstitutional on its face as applied to plaintiff.  This section of the statute was invoked to temporarily suspend plaintiff's operating certificate for Woodcrest. In a judgment entered June 2, 1992, the state court rejected both of plaintiff's claims on the merits.

The DSS then conducted  an administrative hearing to suspend plaintiff's operating certificate.  At the hearing, several DSS employees and psychologists testified, and tapes of

interviews which had been conducted with Woodcrest residents were placed into evidence. At the conclusion of the proceeding, the Administrative Law Judge (hereinafter ALJ) issued a decision sustaining all of the charges.   On the basis of these findings, suspension of plaintiff's operating certificate was made permanent through the end of the licensing year and his application for renewal of the certificate was denied.

Plaintiff sought review of the decision through a state court Article 78 proceeding.  The hearing result was affirmed by the state court on December 16, 1993, <u>Anderson v. Bane</u>, 199 A.D.2d 708, 606 N.Y.S.2d 339 (3d Dept 1993).

Following this state court decision, the DSS served plaintiff with a summons  and complaint demanding a permanent injunction against plaintiff and his agents to close Woodcrest. On June 16, 1992, the New York State Supreme Court, Albany County, issued an Order to Show Cause which directed plaintiff, pending a hearing for a preliminary injunction, to close Woodcrest, to transfer the residents to an appropriate  facility, and provide the DSS with the identities of the transferred residents and the locations to which they had been transferred.

During the period it awaited plaintiff's compliance with the state court order, the DSS was advised that residents were being housed at other locations besides Woodcrest, thereby violating the court order.  The DSS investigated these allegations, and found corroborating evidence, as well as evidence that plaintiff was again housing residents at Woodcrest as late as October 1992.

To avoid a contempt hearing for disobeying the court order, plaintiff sought to avoid punishment by entering into a Stipulation with the DSS  where he essentially agreed to comply with the order and close Woodcrest and not obstruct the DSS's efforts to confirm that it was shut

down.  In an order dated June 23, 1998, this court granted plaintiff leave to file an amended complaint, which was filed on July 8, 1998.

Generally, a set of facts is considered to constitute a single transaction if the facts are closely related in time, space, motivation, or origin, such that treating them as a unit would be convenient for trial. The amended complaint does this. It includes the original complaint's allegations that the defendants conspired  to put plaintiff out of business by fashioning various charges against him leading to the revocation of his license.  The amended complaint further alleges that the defendants used doubtful or undependable reports of  misconduct by plaintiff to bring claims that plaintiff physically or sexually assaulted residents of his adult home which led to the state's closing of the facility.  It also contends that defendants, as part of their conspiracy to close plaintiff's adult home, concocted other charges based on plaintiff's resistance to their attempts to uncover evidence against his wife, against whom a criminal proceeding was then pending.

On November 24, 1998, plaintiff's previous counsel, W. Robert Curtis, Esq., moved for an order permitting  third party discovery compelling videotaped depositions and psychological examinations of mentally retarded witnesses who made the complaints that plaintiff sexually abused them.  On February 15, 1999, defendants opposed plaintiff's effort to obtain depositions and psychological examinations of four mentally retarded and/or autistic individuals who at one time had lived at Woodcrest, and whose testimony had been presented in the administrative hearing by the Department concerning the suspension of plaintiff's operating certificate.

Their testimony had been presented through a process called Facilitated Communication. The  hearing's ALJ specifically declined to give any weight to the testimony of three of these

individuals because he found the Facilitated Communication to be unreliable. However, plaintiff still sought to have these non-party witnesses, subjected to video depositions and psychological examinations. Defendants opposed plaintiff's application for an order permitting such discovery, and this motion was subsequently withdrawn by plaintiff's current counsel, William E. Stanton, Esq., in a letter request to the court dated July 2, 1999. This request was granted, and the motion was withdrawn by this court's order of July 9, 1999.

Three motions are currently before the court, the plaintiff's request for further discovery, the defendants' cross-motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, on the grounds that all of plaintiff's claims were formerly adjudicated in state court, and also barred by the doctrine of qualified immunity. The third motion asks the court to quash plaintiff's subpoena seeking to depose defendants' lead attorney, Assistant Attorney General David D. Roberts, and to require production of the litigation files of the Attorney General's Office.

Defendants' oppose plaintiff's discovery motion, plaintiff has entered opposition to defendant's cross-motion, and David D. Roberts has opposed the motion to have him deposed and produce the litigation files in question.

## DISCUSSION

Summary judgment is appropriate if the pleadings, discovery materials, and affidavits on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S .Ct. 2505, 2510-11, 91 L. Ed.2d 202 (1986);  Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 933 F.2d 162, 166-67 (2d Cir.1991).   A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., *supra*, 477 U.S. at 248, 106 S .Ct. at 2510;  see  Bryant  v. Maffucci, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S. Ct. 152, 116 L Ed.2d 117 (1991). Once the moving party has met its burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a "metaphysical doubt" concerning the facts, or on the basis of conjecture or surmise.  Bryant v. Maffucci, *supra* (citing Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1355-56, 89 L. Ed.2d 538 (1986).  In order to avoid summary judgment, the nonmoving party is under the obligation "to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986); Burke v. Bevona, 931 F.2d 998, 1001 (2d Cir.1991).

Federal Rule of Civil Procedure  45(c) appears to indicate that the appropriate venue for a motion to quash is the court that issued the subpoena.   Thus it states that if the witness serves and files an objection, he need not comply with the subpoena "except pursuant to an order of the court by which the subpoena was issued." Fed.R.Civ.P. 45(c)(2)(B).  Similarly, the Rule directs that the objecting party may seek relief by a motion to quash, but specifies that relief, in the form of an order modifying or quashing the subpoena, is to be issued by "the court by which [the] subpoena was issued."  Fed.R.Civ.P. 45(c)(3)(A). Finally, an unjustified failure to comply with

7

a subpoena "may be deemed a contempt of the court from which the subpoena issued." Fed.R.Civ.P. 45(e).

Because the Rooker-Feldman doctrine deprives a district court of subject matter jurisdiction, it is appropriate to decide this issue as a threshold matter. In Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 125 S. Ct. 1517, 161 L. Ed.2d 454 (2005), the Supreme Court discussed the Rooker- Feldman doctrine and noted that lower federal courts had sometimes interpreted the doctrine far beyond the intent of the original cases. Such interpretation was held to have resulted in "overriding Congress conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superceding the ordinary application of preclusion law pursuant to 28 U.S.C. S 1738." Exxon, 125 S .Ct. at 1521. The Court then held that it was to be limited to those cases commenced by "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. at 1521-22.

Following Exxon, the Second Circuit has set forth a four part test to be used when ascertaining whether Rooker- Feldman deprives a federal district court of subject matter jurisdiction. Hoblock v. Albany County Board of Elections, 422 F.3d 77, 85 (2d Cir.2005). Four conditions must be met before Rooker- Feldman may be put to use:

the federal-court plaintiff must have lost in state court;

the plaintiff must complain of injuries caused by a state-court judgment;

the plaintiff must invite district court review and rejection of that judgment;

and the state-court judgment must have been rendered before the district

8

court proceedings are commenced.

Because the district court proceedings in the instant case were instituted prior to the state court judgment, and proceed in parallel with the ongoing state court litigation, Rooker- Feldman has no application in this matter. Hoblock, 422 F.3d at 85. However, neither Rooker or Feldman lend credence to the impression that appropriate activated concurrent jurisdiction become immaterial if a state court reaches judgment on the same or related question while the case remains *sub juice* in a federal court. Exxon 125 U.S. at 1527. Inasmuch as Rooker - Feldman does nothing to divest this court of subject matter jurisdiction, the court will consider the application of state law principles of preclusion.

According to the doctrine of res judicata, or claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed.2d 411 (1980). The New York Court of Appeals has adopted a transactional approach to res judicata, whereby "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." O'Brien v. City of Syracuse, 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688 (1981).

However, when the initial forum does not have the power to award the full measure of relief sought in the later litigation, later claims arising out of the same transaction or series of transactions are not barred. Antonsen v. Ward, 943 F.2d 198, 201 (2d Cir.1991); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Thus, if the damages sought by a plaintiff in a federal action under  42 U.S.C. § 1983 could not have been awarded in a prior state court Article 78

9

proceeding arising from the same facts, the damages claim is not barred by res judicata. Davidson v. Capuano, 792 F.2d 275, 278 (2d Cir.1986).

The plaintiff in an Article 78 proceeding may recover compensatory damages only if they are incidental to the primary relief sought. N.Y.Civ.Prac.L. & R. S 7806.  Although "New York courts have not fully articulated a comprehensive test" for determining when damages are incidental to the primary relief sought, "substantial New York authority ... indicate[s] that damages for civil rights violations are not included in this category." Davidson, 792 F.2d at 278. Because damages for civil rights violations are not incidental to the primary relief sought, they cannot be awarded in an Article 78 proceeding.  Therefore, under New York law, an Article 78 proceeding does not present a res judicata bar to a later federal § 1983 damages claim based on the same facts.  Fay v. South Colonie Central School District, 802 F.2d 21, 29-30 (2d Cir. 1986).

To prevail on a claim under  42 U.S.C. §1983, a plaintiff must allege: (1) "that some person has deprived him of a federal right" and (2) "that the person who has deprived him of that right acted under color of state ... law."  Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed.2d 572 (1980) (citing  Monroe v. Pape, 365 U.S. 167, 171, 81 S. Ct. 473, 5 L. Ed.2d 492 (1961)). Defendants do not dispute that they are state actors for purposes of this suit.

Plaintiff has alleged  that defendants conspired to violated  his due process rights in the closing of Woodcrest, in depriving him of his liberty interest in his good reputation, and his First Amendment rights by retaliating against him for his criticism of the DSS, its policies and personnel.

Public officials are entitled to immunity from damage actions "insofar as their conduct [did] not violate clearly established ... constitutional rights."  Harlow v. Fitzgerald, 457 U.S.

800, 818, 102 S. Ct. 2727, 2738, 73 L .Ed.2d 396 (1982).  However, in  Siegert v. Gilley, 500 U.S. 226, 111 S. Ct. 1789, 114 L. Ed.2d 277 (1991), the Supreme Court also stated, "a necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is ... whether the plaintiff has asserted a violation of a constitutional right at all."   Thus, the Court held that a threshold inquiry in analyzing an assertion of qualified immunity is whether the plaintiff has alleged a constitutional violation.  Id. at 232,  111 S. Ct. at 1793.

The court finds that there has been no constitutional violation in the present matter with regard to the due process claims in the non-renewal of plaintiff's operating certificate and his asserted liberty interest in his professional reputation, good name, honor and integrity.  Plaintiff alleges a First Amendment violation as to his retaliation claim but  defendants have qualified immunity as to this claim.

A. Due Process Claim

The plaintiff contends that the defendants acts deprived him of his constitutional procedural due process rights in violation of  42 U.S.C. § 1983. Defendants  did this when they did not follow the due process procedure required for determining whether an adult home's operating certificate can be revoked, suspended or limited, as set forth in New York Social Services Law § 460-d, which then provided in pertinent part that:

(b) No operating certificate shall be revoked, suspended or limited without a hearing held in accordance with procedures established by department regulations, which procedures shall require that notice of the time and place of the hearing, and notice of the charges, shall be served in person or by certified mail addressed to the facility at least thirty days prior to the date of the

hearing.  A written answer to the charges may be filed with the department not less than ten business days prior to the date of the hearing. An operating certificate may, nevertheless, be suspended or limited without a hearing for a period not in excess of thirty days, upon written notice to the facility following a finding by the department that the public health, or an individual's health, safety or welfare, are in imminent danger.

(c) Any order or determination to suspend any operating certificate shall specify the manner in which the operating certificate is to be limited. An operating certificate may be found subject to one or more of the following limitations:

(i) a limitation on the period of time for which such certificate remains effective, contingent on a determination that specified violations have been corrected or specified conditions have been met;

(ii) a limitation on the number of persons for which such facility is authorized to provide care;

(iii) a prohibition against the admission of new residents after a specified date.

(d) Any order or determination of revocation, suspension or limitation of the operating certificate shall be subject to judicial review in accordance with article seventy-eight of the civil practice law and rules.

Plaintiff maintains that instead of complying with this statutory procedure,  DSS personnel and defendants unlawfully removed residents from Woodcrest, defamed plaintiff, violated his property and First Amendment rights, and put Woodcrest in an oppressive inspection process including warrantless unannounced on site inspections.  DSS then suspended  his operators certificate for 30 days under Social Services Law § 406-d - 4(a), for failing "to comply

with the requirements of state or local laws or regulations applicable to the operation of such facility." This action led to the Administrative hearing, that affirmed the suspension, which resulted in plaintiff not having his operating certificate renewed, and the eventual closing of Woodcrest.

While plaintiff does not contest that he was provided with due process in the hearing that upheld the suspension, and ultimate non-renewal of his operating certificate, he claims that he has a property right to retain his operating certificate. In support of this position he cites the dictum in Kelly Kare, Ltd. v. O'Rourke, 930 F.2d 170, 176 (2d Cir. 1991), that holds "that there may be a property interest in a providers's status as a qualified health care provider - a question we need not reach." 930 F.2d at176. To prevail on this claim, the plaintiff must show that he "possessed a protected liberty or property interest, and that he was deprived of that interest without due process." Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir.) (*per curiam*), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246, 142 L. Ed.2d 202 (1998). The plaintiff did not meet these two requirements.

Additionally, New York courts have found that there is no property right in a nursing home operator's license. "Petitioners' assertion that they are being deprived of property without compensation because the order of revocation makes no provision for payment to them for their interest in the nursing home must also fail. Petitioners have no property rights in their license. It is merely a personal privilege subject to reasonable restrictions and may be revoked by the issuing authority. Matter of Hodes v. Axelrod, 84 A.D.2d 895, 896, 444 N.Y.S.2d 769, revd. on other grounds 56 N.Y.2d 930, 453 N.Y.S.2d 607, 439 N.E.2d 323. People ex rel. Lodes v. Department of Health, New York City, 189 N.Y. 187, 82 N. E. 187. The State may change the

right to hold a license which it has granted or the conditions under which it may be held.   Such a right is not a vested right (Gleason v. Gleason, 26 N.Y.2d 28, 308 N.Y.S.2d 347, 256 N.E.2d 513).

The purpose of  Social Services Law § 460, et seq., is to ensure that residential facilities, which provide special services and care to mentally disabled adults, maintain certain standards to protect the health and well being of the residents (Social Services Law § 461;  18 NYCRR part 487, et seq.).  The enforcement provisions of  Social Services Law § 460-d would be rendered meaningless, if, once the department concluded that a facility was operated illegally, it could not impose penalties as a means of controlling the operator's conduct and as an inducement to the operator to obtain proper licensing until updated inspections were conducted.   Under the defendant's statutory construction, the department would have the impossible task of determining daily that the violations continued.   Rather, the statute reasonably provides that after the department's determination is rendered, it is the operator's burden to apply for a license and prove that he or she has ceased to violate the provisions of the statute, in order to avoid the imposition of penalties (Social Services Law § 460-d[7][b][1];  [9] [a], [b] ).  Perales v. Bielecki, 621 N.Y.S.2d 94, 95, 210 A.D. 466 (2d Dept. 1994).

Plaintiff has not demonstrated a procedural due process violation in the suspension of his operator's certificate or its non-renewal.

B. Liberty Interest in Reputation, etc.

Plaintiff contends that defendant state actors acting "under color of state law," in violation of the Fourteenth Amendment,  deprived  him of a  liberty interest in connection with their alleged defamation of his person and business over a period of time that finally resulted in

14

the loss of his livelihood.  He claims that he was defamed by the statements and allegations made by defendants outside the legal forum, concerning the treatment of residents, and, most notably sexual crimes,  although plaintiff was not charged with sexual crimes.   These defamatory statements and the clearly improper scientific evidence upon which defendants tried to rely in the Administrative hearing were stigmatizing, and affected residents of Woodcrest  Manor, and tainted the entire process.  Because of the resulting revocation of plaintiff's license ended his status as owner and operator of Woodcrest and his advocacy  for the mentally retarded, any future chance to enter into in a feasible business project became hopeless.  A protected liberty interest may be implicated "where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him."  <u>Wisconsin v. Constantineau</u>, 400 U.S. 433, 437, 91 S. Ct. 507, 508-510, 27 L. Ed.2d 515 (1971).

Plaintiff alleges that the defendants actions deprived him of a  liberty interest in violation of his Fourteenth Amendment rights. To state a valid claim for such an injury, the plaintiff must assert: (1) that he possesses a cognizable liberty interest; and (2) that the defendants deprived him of that liberty without providing process adequate to justify their actions. (<u>Velez v. Levy</u>, 401 F.3d 75, 87 (2d Cir.2005); (<u>DiBlasio v. Novello</u>, 344 F.3d 292, 302 (2d Cir.2003). Plaintiff purports that defendants actions clearly stigmatized him before, during and after they caused the revocation of his adult home operator's license.

Generally, damage to one's reputation is not "by itself, sufficient to invoke the procedural protection of the due process clause." <u>Paul v. Davis</u>, 424 U.S. 693, 701, 96 S. Ct. 1155, 47 L. Ed.2d 405 (1976).   The only way that due process is implicated is if the loss of reputation is coupled with some other tangible injury.  <u>Id</u>. This has been referred to as the "stigma-plus" test.

15

Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir.), *cert. denied*, 493 U.S. 816, 110 S. Ct. 66, 107 L. Ed.2d 33 (1989).   A plaintiff must first prove the "stigma," i.e., the loss of reputation, and also the "plus," which is some other specific liberty interest deprivation which does not flow from the injured reputation.   As the "plus" of his constitutional claim, plaintiff claims loss of professional reputation and loss of potentially viable economic opportunities  from his sullied reputation. Valmonte v. Bane, 18 F.3d 992, 1000-02 (2d Cir.1994).   The Second Circuit has held that "a liberty interest is implicated when a plaintiff can show both harm to his reputation and serious damage to his prospects for future employment in his profession."   Komlosi v. New York State Office of Mental Retardation and Developemental Disabilities, 64 F.3d 810, 817 (2d Cir. 1995).

It is now commonplace that a party may have a liberty interest in his good name, and if his reputation is besmirched by governmental action, it may be entitled to a name-clearing hearing. Wisconsin v. Constantineau, 400 U.S. 433, 437-39, 91 S. Ct. 507, 510-11, 27 L .Ed.2d 515 (1971) ("[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential"); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir.1980).   The injured party's liberty is at stake when governmental action "places on him a stigma or other disability that forecloses  his freedom to take advantage of other employment opportunities."   Board of Regents of State Colleges v. Roth,  408 U.S. 564, 573, 92 S. Ct. 2701, 2702, 33 L .Ed.2d 548 (1972) . To prevail on such a liberty-interest claim, a plaintiff must establish that the information was stigmatizing, false, and publicized by the state actor.   Brandt v. Board of Cooperative Educational Services, 820 F.2d 41, 43 (2d Cir.1987);  Quinn, 613 F.2d at 446;  Gentile v. Wallen, 562 F.2d 193, 197 (2d Cir.1977).

In the instant case, the Administrative hearing before Judge Fry provided plaintiff with a name clearing hearing and the due process he was entitled to. Thus, the court finds that the plaintiff has not established a Fourteenth Amendment claim based on the defendants' alleged defamatory acts.

C. First Amendment Retaliation Claim:

Plaintiff maintains, that as the result of his activism, the defendant DSS employees conspired to retaliate against him by taking steps intended to close down Woodcrest, and deprive him of his sustenance, in violation of his First Amendment rights.

While plaintiff makes constitutional violation claims in this action, defendants claim that their actions were protected by qualified immunity. Qualified immunity is an affirmative defense that shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McCardle v. Haddad, 131 F.3d 43, 50 (2d Cir.1997) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). It is "more than a simple defense--it is an entitlement not to stand trial or face the burdens of litigation." Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir.2002). This doctrine "'strikes a balance between the need on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner, and, on the other hand, to shield officials responsibly attempting to perform their duties in good faith, from having to explain their actions to the satisfaction of a jury.' " Poe v. Leonard, 282 F.3d 123, 131 (2d Cir. 2000) (quoting Locurto v. Safir, 264 F.3d 154, 162-163 (2d Cir. 2001). A defendant should press a qualified immunity defense during pretrial proceedings so that such a claim can be disposed of by summary judgment where possible, or factual disputes material

17

to the defense can be identified and presented to the jury.  Blissett v. Coughlin, 66 F.3d 531, 538 (2d Cir.1995).

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  Hence, even assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully.  Hunter v. Bryant, 502 U.S. 224, 229, 112 S. Ct. 534, 116 L. Ed.2d 589 (1991) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'; (quoting  Malley v. Briggs, 475 U.S. 335, 341, 343, 106 S. Ct. 1092, 89 L. Ed.2d 271 (1986)).

The Second Circuit has observed  that the qualified immunity defense would be "hollow indeed" if public officials "who may in the course of carrying out their duties have continuing run-ins with those whose conduct the officials must monitor, would be forced to go to trial when the only evidence of unconstitutional motive may be a prior dispute with the plaintiff, if that." Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir. 1995).

To state a prima facie case for First Amendment retaliation, plaintiff must prove that "(i) he has an interest protected by the First Amendment, (ii) the defendants' actions were motivated by or substantially caused by the plaintiff's exercise of that right and (iii) the defendants' actions chilled the exercise of those rights." Kerman v. City of New York, 261 F.3d 229, 241-42 (2d Cir.2001).

Plaintiff claims that, in order to keep his operating certification, he was required to submit to annual inspections as well as satisfy many administrative regulations, but as his

relationship with the DSS began to become strained, Woodcrest became susceptible to various administrative enforcement actions such as accounting, financial practices, resident accounts, resident employment, incidents of assault within the facility, programs provided for residents and relationships with outside agencies such as workshops, the nature of the facilities and code enforcement, fire code/sprinkler compliance, nutrition and medical issues, staffing, and the issue of access to the State for inspection purposes.

Government has a substantial interest in the state and federal regulation of nursing homes, and it can hardly be challenged that the interest is of the highest order. Nursing home patients generally are elderly, infirm, or disabled and no longer under the immediate care of their loved ones. An awesome burden is placed on government agencies insuring that the elderly and infirm entrusted to nursing homes are given the care and protection required by state and federal health laws. Many patients at nursing homes are helpless and their physical and mental well being and quality of life are often at the mercy of the operators and staff. Mistreated patients may find it difficult or impossible to contact regulatory officials or to rebut denials by the operator or staff regarding conditions of care. Governmental onsite inspections, announced and unannounced, are thus essential to the enforcement of the regulatory schemes for nursing homes. Blue v. Koren, 72 F.3d at 1081; Uzzillia v. Commissioner of Health of the State of New York, 42 App. Div.492, 497, 367 N.Y.S.2d 795, 801 ( 2d Dept. 1975), App. Dism. 37 N.Y.2d 186, 375 NYS2d 1031 (1997).

In New York State, adult residential care programs function in a regulatory environment that demands strict enforcement of laws, rules and procedures. § 460 of the New York Social Services Law states, "that residential care programs for adults and children of the highest

quality, efficiently produced and properly utilized at a reasonable cost, are matters of vital concern to the people of this state." This legislative intent has given the DSS broad reaching enforcement powers including the power to "undertake an investigation of the affairs of the management of any facility subject to the inspection and supervision positions of this article or any person, corporation, society, association or organization which operates or holds itself out as being authorized to operate any such facility." (Social Services Law § 460-d).

The DSS has comprehensive authorizations with respect to the inspection of adult care facilities within its jurisdiction. Under § 461-a of the New York Social Services Law, the DSS is mandated to conduct at least one unannounced inspection per year and at least one full inspection, and is authorized under subdivision (d) to conduct additional inspections as deemed necessary to enforce statutory standards. Under 18 NYCRR § 486.2, the types of inspections undertaken by the department include, but are not limited to:

(1) complete inspections conducted prior to certification or renewal, or, in facilities with serious or continual deficiencies, to determine compliance with regulatory provisions in all areas of operation;

(2) summary inspections to determine compliance with key regulatory provisions in all areas of operation;

(3) partial inspections conducted to examine specific areas of operation; this inspection may examine key regulatory provisions in any one area or be a thorough examination of every regulation pertaining to that area;

(4) complaint inspections conducted in order to determine the validity of a complaint concerning a facility;

(5) follow-up inspections conducted in order to determine whether deficiencies noted during another inspection have been corrected; and

(6) such other inspections as may be necessary to ascertain compliance in a certified facility or to determine if an uncertified facility should be classified as an adult care facility.

§ 486.2(b) provides that "Inspection shall mean a process of inquiry and investigation which shall include, but need not be limited to, announced and unannounced onsite investigations, private interviews with residents, review and investigation of the books and records of the facility, gathering of written, photographic or other physical evidence, and such collateral contacts as the department deems necessary for the purpose of determining compliance with applicable laws and regulations."

Defendants Mary Hart and Terrance McGrath, and other DSS personnel were directly involved in the investigations of numerous serious violations of law and DSS regulations pertaining to adult homes. Investigated were allegations of resident abuse perpetrated by plaintiff, as well as other allegations of significant violations that had adversely impacted upon Woodcrest Manor residents. Their findings were the basis for the charges brought against plaintiff in his Administrative hearing that later resulted in the closure of Woodcrest. The decision made in the Administrative hearing was affirmed in an Article 78 proceeding, Anderson v. Bane, 606 N.Y.S.2d 339, 199 A.D.2d 708 (Third Dept. 1993). Plaintiff made no further appeal of the matter.

"In order to state a valid First Amendment claim for retaliation, a plaintiff must allege that he or she engaged in conduct that was constitutionally protected and that retaliation against

the protected conduct was a 'substantial' or 'motivating' factor in the defendant's actions."
Gagliardi v. Village of Pawling, 18 F.3d 188, 194-95 (2d Cir.1994) . On a "motion for summary
judgment asserting a qualified immunity defense in an action in which an official's conduct is
objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must
proffer particularized evidence of direct or circumstantial facts, as suggested in Justice Kennedy's
concurrence in Siegert v. Gilley, 500 U.S. 226, 111 S. Ct. 1789, 1795, 114 L. Ed.2d 277 (1991),
supporting the claim of an improper motive in order to avoid summary judgment." Id. at 1084,
111 S. Ct. 1789; Hemphill v. Schott, 141 F.3d 412, 420 (2d Cir.1998); Ford v. Moore, 237 F.3d
156, 162 (2d Cir.2001).  This evidence may include "expressions by the officials involved
regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff
has been singled out, or the highly unusual nature of the actions taken. Id. Lastly, "a conclusory
proffer of an unconstitutional motive should not defeat the motion for summary judgment." Id.

Here, plaintiff does not submit any particular facts supporting his allegation of retaliation.
He merely alleges that was tainted by defendants' desire to seek revenge for his advocacy for the
mentally disadvantaged. He does not allege, however, that prior to the Woodcrest proceedings,
defendants ever attempted to check his advocacy activities until they did so in the closing of his
facility.  While plaintiff may have been an advocate, the loss of Woodcrest did not take place
because of his advocacy activities, it occurred because an administrative procedure was  held,
and after a lengthy hearing, the ALJ found that he was guilty of serious misconduct by not
complying with statutory requirements, and that  the continuing  of the inappropriate operation
of the home presented a danger to the residents. This decision was upheld in state court, and not
appealed.  In contrast to plaintiff's  conclusory allegation, the record evidence supports a finding

that the DSS conducted a proper investigation that was fully authorized by law.

Furthermore, plaintiff submits little evidence that defendants made any inappropriate statements or remarks that could reveal an improper motive or conspiracy,  that they inappropriately singled him out, or they took any unusual actions at all during the course of the investigation of the operation of Woodcrest.  The exhibits attached to his amended complaint include various correspondence and other documents which defendants and other DSS personnel prepared or received concerning the shut down of Woodcrest  Manor which, he alleges, shows the conspiracy at work.  However, an examination of these documents also indicates  that their purpose was in carrying out their very serious  responsibilities to protect Woodcrest residents from further abuse or harm.

The inspections made by DSS personnel at Woodcrest Manor were certainly authorized. Nursing homes are a highly regulated industry, and some tension between operators of homes and regulators is to be expected, as are occasional adversary proceedings.   The court does not believe that a showing of  rigorous of inspections prior to an  administrative proceeding is a sufficiently particularized showing of improper motive.   While such a temporal sequence may fuel a nursing home operator's suspicions, it does not suffice to satisfy the heightened evidentiary standard.   Damage actions have collateral effects upon regulators that may impact negatively upon the beneficiaries of the regulation, in this case some of our most defenseless people. If a damage action could be brought because of unrelated and otherwise lawful regulatory actions--here mandatory inspections--the regulatory scheme might well be undermined.  Blue v. Koren, 72 F.3d at 1083.

Defendants are entitled to qualified immunity on plaintiff's retaliation claim.

Accordingly, plaintiff's request for additional discovery is **DENIED** as **MOOT,**

defendants' motion for summary judgment is **GRANTED** and the complaint is **DISMISSED**,

and defendants' motion to quash plaintiff's deposition subpoena is **GRANTED** and it is

**QUASHED.**

**IT IS SO ORDERED**.

Dated: June 6, 2006
Syracuse, New York

Howard G. Munson
Senior  U.S. District Judge